IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL BUSH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:13-CV-2200-D |
| VS. | § | |
| | § | |
| JEH JOHNSON, SECRETARY, | § | |
| DEPARTMENT OF HOMELAND | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

In this action by a Caucasian government employee alleging that he was subjected to

a racially hostile work environment and retaliated against, in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and that his rights under

the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, were violated, both sides move

for summary judgment. For the reasons explained, the court denies plaintiff's motion, grants

defendant's motion, and dismisses this action with prejudice.

I

Plaintiff Michael Bush ("Bush"), a non-Hispanic Caucasian, is currently employed

by U.S. Immigration and Customs Enforcement ("ICE") as a Supervisory Detention and

Deportation Officer ("SDDO").[1]  At all times relevant to this lawsuit, he was stationed at

---

[1]Because both parties move for summary judgment, the court will recount the
evidence that is undisputed, and, when it is necessary to set out evidence that is contested,
will do so favorably to the party who is the summary judgment nonmovant in the context of

ICE's Enforcement and Removal Operations ("ERO") Division in Lubbock, Texas, which is under the supervision of the Dallas Field Office.  From January 2009 until January 2011 (except for a brief period in November 2010), Deputy Field Officer Director ("DFOD") Pablo E. Campos ("Campos"), who is Hispanic, was Bush's second-line supervisor, and Assistant Field Office Directors ("AFODs") Roy Hernandez ("Hernandez") and Joel T. Lawson ("Lawson") were Bush's first-line supervisors.  From January 2011 through March 2011, Campos' second-line supervisor was Field Office Director Nuria Prendes ("Prendes").

On March 25, 2011 Bush filed an equal employment opportunity complaint ("EEO Complaint 1") against Campos alleging discriminatory acts based on race, retaliation, and hostile work environment.  In support of EEO Complaint 1, Bush alleged, *inter alia*: (1) on February 11, 2009, in response to a statement that Bush was a "very good officer," Campos responded, "that was not what he had been told about [Bush]," D. 12/24/14 App. 460; (2) in March 2010, during a discussion about the future expansion of the Lubbock Sub-Office, Campos looked at Bush and, using a "sarcastic voice," told him that once there was "another SDDO on duty in the Lubbock Sub-Office[,] [Campos] was going to remove [Bush] as the supervisor of the Fugitive Operations Team and place [him] into [the Criminal Alien Program]," *id.* at 462; (3) during a conference call on June 2, 2010, Bush told Campos that he was having difficulty keeping up with all of the conflicting policies, guidelines, and

---

that evidence.  *See, e.g., GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.) (quoting *AMX Corp. v. Pilote Films*, 2007 WL 1695120, at *1 n.2 (N.D. Tex. June 5, 2007) (Fitzwater, J.)).

tasking coming from headquarters and the field office, in response to which Campos "became irate" and told Bush that he "needed to stay in the office instead of going out on the street with [his] fugitive operations team and read all the policies, guidelines and tasking since he does," *id.*; (4) on July 2, 2010 Bush received an email concerning new guidance on entering veteran identification data in a law enforcement information system called "ENFORCE," Bush responded to the email with his own suggestions, and Campos replied, "[s]tick to the guidance," *id.* at 463; (5) on November 5, 2010 Bush was notified that ICE was going to require a Deportation Officer from West Texas to go on a detail to Arizona, and, during the communications about this issue, Campos sent an email containing a "one line statement," stating, "[s]end a name to Enedelia. . .," *id.* at 465 (ellipsis in original), and a second email "with the word 'Disregard' as the first line of the message body," *id.* (bold font and italics omitted), which stated:

> Enedelia says she sent to you before Dallas had chance to respond as FDA was next.  She also says that she already told you this when you called her and Frank, when he advised you FDA already had a name, even before you sent the below email. W. Texas' turn is next for next week's 45-day TDY to Harlingen, name due by 10 NOV.  Start canvassing.

*id.* (internal quotation marks omitted); and a third email that stated, "I spoke to Enedelia already.  'What we got here is a failure to communicate.'  Thanks all.  Have a good weekend," *id.* at 466; (6) on January 5, 2011 Campos "scrutin[ized]" a home to work ("HTW") vehicle request that Bush made, and the following day, Campos brought up the HTW issue and form that Bush had signed during a Field-Office-wide management

conference call and stated that, after instructing everyone not to interrupt him until he was finished speaking, "there seems to be some issue with the interpretation of the home to work policy[, and] that the policy is written at the 8th grade level and if you don't understand it then you have a problem," *id.* at 468; and (7) in late 2010 and January 2011, Campos enforced against a Caucasian, but not against any other employees, an email signature block policy that prohibited employees in the Dallas Field Office from including religious or personal quotations as part of the individual's signature block.

On December 17, 2010 Campos sent an email to all Dallas supervisors that included in the body of the email the following quotation: "Call a truce, then, to our labours—let us feast with friends and neighbours.  And be merry as the custom of our caste; For if 'faint and forced the laughter,' and if sadness follow after, We are richer by one mocking Christmas past.  R. Kipling."  *Id.* at 471 (some internal quotation marks omitted).  Bush alleges that this statement was "religious/faith based" and used the word "caste," which he interpreted as a "subtle and veiled racial remark/epitaph [*sic*[2]]."  *Id.* at 471.

Bush contends that, in retaliation for his filing EEO Complaint 1, Campos enforced ICE's email signature block policy (which was implemented around March 10, 2011) against him but not against any other employees, including two non-Caucasian employees who were also violating the policy and who also worked directly under Campos; and that Campos retaliated against him by "t[aking] issue" with an HTW authorization that Bush had

---

[2] Bush probably meant an "epithet," not an "epitaph."

submitted for SDDO William Tupy, also a Caucasian employee, which had been reviewed and approved by Bush's supervisor, Lawson, and which was also ultimately approved by Prendes.

On December 9, 2011, while EEO Complaint 1 was pending, Bush applied for an open AFOD position in Big Spring, Texas.  He was selected as one of five finalists, each of whom was required to interview with a three-member panel that included Campos, DFOD Jeffrey D. Lynch ("Lynch"), and AFOD Bradley L. Douglas ("Douglas").  The panel interviewed Bush on January 18, 2012.  Campos' immediate supervisor, Prendes, was the selecting official for the position.  She instructed the panel to give her the names of the five finalists, without ranking or scoring them, along with the interviewers' notes and comments from the interviews.   The panel prepared a memorandum that did not include a recommendation for a single candidate.  Campos did inform Prendes, however, that the "panel" recommended John Roemer ("Roemer") "hands down."  P. 12/19/14 Br. 5.  Campos contends that this statement was untrue because Lynch and Douglas stated in declarations that they never gave a recommendation.

On February 3, 2012 Prendes submitted a memorandum and application packet to the Executive Career Board ("Career Board") at ICE headquarters in Washington, D.C., recommending Roemer for the AFOD position in Big Spring and seeking approval of her recommendation.   David Venturella ("Venturella"), the Assistant Director for Field Operations who was the selecting official for the AFOD position in Big Spring, reviewed Prendes' recommending packet and selected Roemer.

In April or July 2012 Bush filed a second equal employment opportunity complaint ("EEO Complaint 2"),[3] this time alleging that he was not selected for the Big Spring AFOD position due to retaliation.   On May 14, 2013 the Equal Employment Opportunity Commission ("EEOC") issued a judgment against Bush on EEO Complaint 1.[4]  Bush then filed this lawsuit against the Secretary of the Department of Homeland Security[5] (hereafter referred to as "DHS"), alleging claims for hostile work environment and retaliation, in violation of Title VII, and for violating FOIA.  Bush and DHS both move for summary judgment.

## II

When a party moves for summary judgment on a claim on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party does so, the opposing party must go beyond his pleadings and designate specific facts showing there is a genuine issue for trial.  *See id.* at 324; *Little v. Liquid Air*

---

[3]The amended complaint alleges that he filed EEO Complaint 2 on April 6, 2012, *see* Am. Compl. ¶ 23, and Bush's appendix contains evidence that it was filed on July 13, 2012, P. 12/19/14 App. 762.

[4]Concerning EEO Complaint 2, Bush alleges that more than 180 days have passed since he filed the complaint but that no decision has been issued.

[5]Janet Napolitano was the Secretary of the Department of Homeland Security when Bush filed suit. Jeh Johnson is the current Secretary and therefore the defendant.  *See* Fed. R. Civ. P. 25(d).

*Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the opposing party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The opposing party's failure to produce proof as to any essential element of a claim renders all other facts immaterial.  *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.).  Summary judgment is mandatory if the opposing party fails to meet this burden.  *Little*, 37 F.3d at 1076.

When a party moves for summary judgment on a claim on which he will have the burden of proof at trial, he "must establish 'beyond peradventure all of the essential elements of the claim or defense.'"  *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  This means that the moving party must demonstrate that there are no genuine and material fact disputes and that he is entitled to summary judgment as a matter of law.  *See Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003).  "The court has noted that the 'beyond peradventure' standard is 'heavy.'"  *Carolina Cas. Ins. Co. v. Sowell*, 603 F.Supp.2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

III

The court turns first to Bush's claim that he was subjected to a racially hostile work environment.

A

Generally, to establish a prima facie case of a hostile work environment, a plaintiff must show the following:

> (1) [he] belongs to a protected group; (2) [he] was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (citations omitted).[6] "Harassment is based on race if 'the complained-of conduct had a racial character or purpose.'" *King v. Enter. Leasing Co. of DFW*, 2007 WL 2005541, at *10 (N.D. Tex. July 11, 2007) (Fitzwater, J.) (quoting *Harris-Childs v. Medco Health Solutions, Inc.*, 2005 WL 562720, at *6 (N.D. Tex. Mar. 10, 2005) (Means, J.)). Plaintiffs must demonstrate a "connection between the allegedly harassing incidents and [their] protected status." *Id.* (alteration, citation, and internal quotation marks omitted). Regarding the fourth element,

---

[6]The fifth element need not be established if the harassment is allegedly committed by the victim's supervisor. *Wooten v. Fed. Express Corp.*, 2007 WL 63609, at *19 (N.D. Tex. Jan. 9, 2007) (Fitzwater, J.) (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001)), *aff'd*, 325 Fed. Appx. 297 (5th Cir. 2009).

> [h]arassment affects a term, condition, or privilege of employment if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Workplace conduct is not measured in isolation. In order to deem a work environment sufficiently hostile, all of the circumstances must be taken into consideration. This includes the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. To be actionable, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citations and internal quotation marks omitted). "A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998). Merely offensive conduct is not actionable. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "[T]he Supreme Court has warned that these high standards are intentionally demanding to ensure

that Title VII does not become a general civility code, and when properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language." *Howard v. United Parcel Serv., Inc.*, 447 Fed. Appx. 626, 632 (5th Cir. 2011) (per curiam) (citations and internal quotation marks omitted) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

B

DHS maintains that it is entitled to summary judgment because there is no competent summary judgment evidence that the harassment of which Bush complains was based on his race or that it was so "severe and pervasive" that it altered the conditions of his employment and created a hostile work environment.

Bush responds that he has provided more than conclusory allegations and speculation that he was a victim of race-based harassment. He posits that "Campos' arrogant and racially superior demeanor is evidenced by his harassment of Bush, and other non-minorities, and his favoritism shown towards other Hispanics," P. 12/19/14 Br. 15; that coworker Terry Newman ("Newman") perceived the Rudyard Kipling poem that Campos copied into an email to be racist, given its support of the caste system; that Campos' use of a religious text in an official email shows that he believed that, by virtue of being Hispanic, he was superior to others; that Newman, Lawson, and Prendes overheard Campos use "racial slurs" such as "La Raza,"[7] "pinche gringos," and "gringo"; that coworker Gary Gilberg ("Gilberg") felt that

---

[7]According to Newman, the term "La Raza" refers to a cultural belief that Hispanics are the "top race." P. 1/14/15 Br. 9.

an incident in a locker room during which Campos exposed himself suggested that Campos was exhibiting "machismo" and felt "it's something that is with the Hispanic heritage it's the individual showing they're better than others," P. 12/19/14 App. 173-74; that Campos' mannerisms and the way and tone with which he spoke to Bush demonstrated Campos' belief in his racial superiority, because he did not express the same sentiments of disdain, contempt, dislike, aggravation, and irritation when interacting with Hispanic males; and that Caucasian supervisors complained to Lawson about Campos' treatment of them based on race. Bush also contends that the harassment to which he was subjected was subjectively and objectively hostile, and that Campos' harassment affected the terms, conditions, and privileges of his employment because Campos ordered him to review and sign off on the case files of subordinates of SDDO Chris Medina ("Medina") and ordered Bush to do Medina's work; Bush was forced to relocate his family from Dallas to Lubbock, at an economic loss, to escape Campos' harassment; in March 2010 Campos threatened to remove Bush from his position; and Campos selectively enforced the email signature block policy against Caucasian employees.

C

The court concludes that a reasonable jury could not find that Campos' conduct was sufficiently hostile or abusive to create a racially hostile work environment. In response to DHS's summary judgment motion, Bush relies on the following evidence: (1) Campos ordered Bush to do a Hispanic employee's work; (2) Campos stated during a March 2010 meeting that "he had the right to move [Bush] . . . from fugitive operations to the other one,"

*id.* at 212-13; (3) Bush was forced to relocate his family from Dallas to Lubbock in November 2008 to escape Campos' harassment; and (4) Campos selectively enforced the email signature block policy against Caucasian employees but not against non-Caucasian employees.  In Bush's summary judgment motion, he relies on evidence that during a June 2, 2010 conference call with other supervisors, Campos "became irate" and told Bush that if he did not understand the policies, he "need[ed] to start staying in the office," *id.* at 87; and that on January 6, 2011 Campos responded to Bush's request for clarification of a policy by stating that the policy was written on an eighth grade level.

To determine whether a jury could find a racially hostile work environment, the court considers "all the circumstances." *Faragher*, 524 U.S. at 787.  As noted above, "[w]orkplace conduct is not measured in isolation.  In order to deem a work environment sufficiently hostile, all of the circumstances must be taken into consideration." *Hernandez*, 670 F.3d at 651 (citations and internal quotation marks omitted).  A reasonable jury could not find that these incidents, individually or in combination with each other, which occurred over the course of nearly 2½ years, and several of which were not even racial in character or purpose, were sufficiently pervasive or severe to establish a hostile work environment based on Bush's Caucasian race, i.e., that the conduct was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment. *Ramsey*, 286 F.3d at 268.

Selective enforcement of DHS's email signature block policy does not necessarily indicate conduct giving rise to a hostile work environment claim.  *See, e.g., Brooks v.*

*Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) ("selective enforcement of a time and attendance policy does not necessarily indicate conduct giving rise to a hostile work environment claim."); *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 74 (1st Cir. 2011) (concluding that selective enforcement of workplace rules and the failure to extend certain informal courtesies are part of conduct that is "far from severe [and] never physically threatening.").

The three allegedly harassing statements that Campos made to Bush—that if Bush could not understand the policies he should stay back in the office, that a certain policy was written on an eighth grade level, and that he had a right to remove Bush from his position—are neither of themselves racial in character or purpose, *see King*, 2007 WL 2005541, at *10, nor has Bush adduced evidence (other than the unsubstantiated and conclusory observations of coworkers) that would enable a reasonable jury to find that any of these statements was based on Bush's Caucasian race, *see, e.g., Islamic Ass'n of DeSoto, Texas, Inc. v. Mortgage Electronic Registration Systems, Inc.*, 2013 WL 169229, at *7 n.11 (N.D. Tex. Jan. 16, 2013) (Fitzwater, C.J.) ("Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence." (citing *Morris v. Covan World Wide Moving, Inc*., 144 F.3d 377, 380 (5th Cir. 1998); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994))).

Even if the court assumes *arguendo* that a reasonable jury could find that the harassment of which Bush complains was based on his Caucasian race, the jury could only find that these three statements, made over a ten-month period, were isolated and were

neither sufficiently severe nor pervasive to alter the terms or conditions of Bush's employment. *See, e.g., Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (citation and internal quotation marks omitted)).   Conduct that would violate a general civility code is not of itself sufficiently severe to create a racially hostile work environment.

Regarding the allegation that Campos asked Bush to do a Hispanic employee's work, Bush offers his own conclusory assertions:

> [Campos] would allow the Hispanic SDDO, Chris Medina, to come in late and disappear, and Campos required me to review all of SDDO Medina's subordinates' case files and sign off on them.   When I sent SDDO Medina's employees to AFOD Campos for Campos to review and sign off on their files, Campos became angry and ordered me to do SDDO Medina's work.

P. 1/14/15 App. 2.  Bush offers no evidence, other than the fact that Medina is Hispanic, that would enable a reasonable jury to find that Campos' assigning Medina's work to Bush was motivated by hostility towards Bush's Caucasian race.   And Bush provides no evidence regarding the amount of Medina's work that he was asked to do or whether he was asked to do so repeatedly or only one time.  Without these details, a reasonable jury could not find that Campos' conduct in assigning Medina's work to Bush was so severe or pervasive that it altered the conditions of his employment and created a hostile work environment.  *See Ramsey*, 286 F.3d at 268.  Bush is bringing a hostile work environment claim based on these allegations, not a Title VII-based race discrimination claim.   He must therefore produce

- 14 -

evidence that would enable a reasonable jury to find a hostile work environment, not merely isolated acts of race discrimination.

Bush's evidence that in November 2008 he was forced to relocate his family from Dallas to Lubbock to escape Campos' harassment would not of itself enable a reasonable jury to find that Campos' conduct was *racially* hostile.   This evidence could be probative regarding whether Bush perceived the Dallas work environment to be *subjectively* offensive, but to be actionable, the work environment must also be *objectively* offensive, one that a reasonable person would find hostile or abusive.  *See Hernandez*, 670 F.3d at 651.  And the mere fact that Bush desired to escape what he perceived as Campos' harassment, particularly given the dearth of other summary judgment evidence, would not enable a reasonable jury to find that Bush was subjected to a hostile work environment.

Bush also relies on evidence that Newman, Lawson, and Prendes overheard Campos use racial slurs.  Assuming that this evidence would be probative of whether any aspects of Campos' conduct were racially motivated, isolated statements are insufficient to create a hostile working environment.  *See, e.g., Mosley v. Marion Cnty., Miss.*, 111 Fed. Appx. 726, 728 (5th Cir. 2004) (per curiam) (holding that evidence of three incidents involving racial slurs was insufficient to support hostile work environment claim); *Faragher*, 524 U.S. at 788 ("isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" (citation and internal quotation marks omitted)).  Remarks demonstrating a less severe degree of racial animus must be pervasive to alter a term, condition, or privilege of employment.  *See Lauderdale v. Tex. Dep't of Crim. Justice,*

*Inst. Div.*, 512 F.3d 157, 163 (5th Cir. 2007).  The severity of harassing conduct that a plaintiff must show varies inversely with the pervasiveness of the conduct.  *Id.*  Bush offers no evidence of the severity, context, or frequency of Campos' alleged use of racial slurs.  Nor does he adduce any evidence that Campos ever directed a racial slur at him, that Campos used racial slurs in his presence, that Bush actually overheard Campos using racial slurs,[8] or that Bush knew, prior to filing this lawsuit, that Campos had used these slurs.  Accordingly, a reasonable jury could not find under the circumstances here that Campos' use of racial slurs created a hostile work environment.

Bush also relies on evidence that Campos exposed himself in a locker room in a way that another employee interpreted as suggesting that Campos was exhibiting "machismo." He does not adduce any evidence, however, that he was present when this incident occurred, that he witnessed Campos' actions, or that he even knew about the incident before bringing this lawsuit.[9]  Even assuming that Bush did witness the event, he has adduced no evidence, other than the subjective opinion of a coworker, that Campos' behavior was based on race

---

[8]The court does not suggest that to establish a racially hostile work environment, a plaintiff must always have been personally subjected to, or at least seen or heard, the use of racial slurs.  *See generally Hernandez*, 670 F.3d at 653 (discussing admissibility of evidence of harassment against individuals other than plaintiff's protected class, discrimination against workers other than the plaintiff, harassment of persons other than the plaintiff, and cross-category discrimination, and noting that "before a workplace environment may be found sufficiently hostile, a wide array of considerations are to be examined." (citing *Ramsey*, 286 F.3d at 268)).  But the absence of such proof in the circumstances of this case would prevent a reasonable jury from finding on this basis that Bush was subjected to a racially hostile work environment.

[9]*See supra* note 8.

or constituted anything other than an isolated incident.  It is settled that "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Faragher*, 524 U.S. at 788.[10]

The remainder of Bush's evidence consists of other employees' opinions that Campos' "mannerisms, actions, and language," P. 1/14/15 Br. 13, and the way Campos generally treated Caucasian employees with disdain, contempt, dislike, aggravation, and irritation, but did not similarly treat Hispanic employees, suggests that "the harassment received by Bush was based on race," *id.* at 11.  This evidence, however, is conclusory and speculative, and it cannot alone defeat DHS's motion for summary judgment.  *See Islamic Ass'n of DeSoto*, 2013 WL 169229, at *7 n.11 (citing *Morris*, 144 F.3d at 380; *Forsyth*, 19 F.3d at 1533).

When determining whether a plaintiff has been subjected to a hostile work environment, the court focuses on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct was physically threatening or humiliating, and the degree to which the conduct unreasonably interfered with an employee's work performance.  *See, e.g., Ramsey*, 286 F.3d at 268.

---

[10]Nor is Bush's evidence that Campos included a quotation from Rudyard Kipling's poem, "Christmas in India," in an email to all supervisors sufficient to enable a reasonable jury to find that Campos subjected Bush to a hostile work environment.  Evidence that one employee (Newman) subjectively believed that the use of the word "caste" in a poem generally describing Christmas in India was meant to represent Campos' belief that the Hispanic race is superior is purely speculative, and it is insufficient to prevent summary judgment.  Moreover, a reasonable jury could not find that Campos' use of the poem in the body of an email violated the email signature block policy.  The poem was not included in Campos' signature block, and the email was sent before DHS implemented the email signature block policy.

> The question for the jury is not whether the racial conduct at issue was appropriate in the workplace or deserves condemnation.  The issue is whether, under the totality of the circumstances, the conduct was severe and pervasive enough to alter the terms and conditions of employment and create an abusive working environment.

*Jones v. Dallas Cnty.*, 47 F.Supp.3d 469, 491 (N.D. Tex. 2014) (Fitzwater, C.J.).  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."  *Harris*, 510 U.S. at 21.  Considering together all of the summary judgment evidence on which Bush relies, the court holds that a reasonable jury could not find that Bush was subjected to a racially hostile work environment.  The court therefore grants summary judgment dismissing Bush's racially hostile work environment claim.

## D

Bush moves for summary judgment in his favor on his hostile work environment claim.  His motion is denied for two reasons.  First, because Bush will have the burden of proof at trial on this claim, he must satisfy the "heavy" beyond peradventure standard, and he has not done so.  Second, DHS is entitled to summary judgment dismissing this claim, so it follows that Bush is not entitled to summary judgment establishing his right to recover on it.

IV

Bush also brings a retaliation claim under Title VII.

A

Title VII prohibits employers from retaliating against employees who engage in a protected activity. 42 U.S.C. § 2000e-3(a).[11] Because Bush relies on circumstantial evidence to support his retaliation claim, he must proceed under the familiar *McDonnell Douglas*[12] burden shifting framework. *See, e.g., Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) ("A retaliation claim that is premised on a pretextual rationale for dismissal is analyzed under the *McDonnell Douglas* framework.").

Bush must first demonstrate a prima facie case of retaliation by showing that (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action. *See, e.g., Walker v. Norris Cylinder Co.*, 2005 WL 2278080, at *9 (N.D. Tex. Sept. 19, 2005) (Fitzwater, J.) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)). As to the third element, the requirement that a plaintiff show at the prima facie case stage a "causal

---

[11]42 U.S.C. § 2000e-3(a) provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

[12]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

link" between a protected activity and an adverse employment action is "much less stringent" than the "but-for" causation that a jury must find. *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *see also Khanna v. Park Place Motorcars of Hous., Ltd.*, 2000 WL 1801850, at *4 (N.D. Tex. Dec. 6, 2000) (Fitzwater, J.) (characterizing this prima facie case burden as "minimal").

If Bush establishes a prima facie case, the burden shifts to DHS to articulate a legitimate, nonretaliatory reason for the alleged retaliatory action taken. *Walker*, 2005 WL 2278080, at *9. This burden is one of production, not of proof. *See Wooten v. Fed. Express Corp.*, 2007 WL 63609, at *16 (N.D. Tex. Jan. 9, 2007) (Fitzwater, J.), *aff'd*, 325 Fed. Appx. 297 (5th Cir. 2009).

If DHS meets its production burden, the burden shifts back to Bush to produce evidence that would enable a reasonable jury to find that retaliation for Bush's protected conduct, rather than DHS's proffered legitimate, nonretaliatory reason, was the "but-for cause" of his termination. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S.Ct. 2517, 2528 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *see also, e.g., Coleman v. Jason Pharms.*, 540 Fed. Appx. 302, 304 (5th Cir. 2013) (per curiam) ("An employee establishes pretext by showing that the adverse action would not have occurred 'but for' the employer's retaliatory reason for the action." (citing *Nassar*, 133 S.Ct. at 2533-34)). "In order to avoid summary judgment, [Bush] must show 'a conflict in substantial evidence' on the question of whether [DHS] would not have taken the action 'but for' the protected activity."

*Coleman*, 540 Fed. Appx. at 304 (quoting *Long*, 88 F.3d at 308).

B

The court begins with Bush's prima facie case.

1

DHS disputes only the third element of the prima facie case, contending that Bush cannot establish causation because he relies solely on temporal proximity despite the fact that almost 12 months elapsed between when he engaged in his EEO activity and when he was not selected for the Big Spring AFOD position. DHS maintains that Bush's claim of causation is further weakened by the fact that Campos was just one of several persons involved in the objective selection process for the Big Spring AFOD position.

Bush responds that DHS mischaracterizes the temporal proximity between the filing of EEO Complaint 1 and his non-selection for the AFOD position because, although he filed EEO Complaint 1 in March 2011, Campos had given a declaration to the EEO investigator on October 3, 2011, just 3½ months (107 days) before the panel (which included Campos) interviewed Bush for the AFOD position. Bush also contends that a causal link is established because Campos participated in the interview process even though Bush's EEO proceedings against him were ongoing, and interfered with the interview process by telling Prendes that the panel recommended Roemer "hands down," even though Prendes had asked for the five top candidates not to be ranked, and even though this statement was untrue.[13]

_____

[13]Bush also contends that a causal link is established by evidence that, after the interview, Campos told Prendes that Bush had answered the interview questions so well that

- 21 -

2

The standard for satisfying the causation element at the prima facie stage is "much less stringent" than the "but-for" causation that a jury must find. *Montemayor*, 276 F.3d at 692. "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (citing *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993)). The temporal proximity, however, must be very close. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing with approval *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (stating that 1½ month period between protected activity and adverse action could, by itself, establish causation)).

The only protected activity in which Bush engaged before Roemer was selected for the AFOD position occurred on March 25, 2011, when Bush filed EEO Complaint 1.[14] Roemer was selected for the AFOD position on February 14, 2012. This leaves an almost 11-month gap between the date Bush filed his EEO complaint and the date he was not selected for the AFOD position. Viewing this interval in isolation, it likely would qualify as the "very close" temporal proximity that this circuit requires. But this is not the only

he must have had the interview questions in advance, implying that Bush cheated during the interview.

[14]Although Bush's EEO Complaint 2 also constitutes a "protected activity," EEO Complaint 2 was filed *after* Roemer was selected for the AFOD position. Bush does not allege any act of retaliation that occurred after he filed EEO Complaint 2.

evidence on which Bush relies, and the causation element that the plaintiff must establish at the prima facie case stage is "much less stringent" than the "but-for" causation that a jury must find. *Montemayor*, 276 F.3d at 692. It is undisputed that, at the time the panel interviewed Bush for the Big Spring AFOD position, the investigation of his EEO Complaint 1 was still ongoing. Campos had given a declaration to the EEO investigator on October 3, 2011, just 3½ months before the panel interviewed Bush for the AFOD position. Bush has also produced evidence that Campos disregarded Prendes' instructions to give her an unranked list of the top five candidates, and, instead, misrepresented to Prendes that the panel recommended Roemer "hands down"; that, as a result of this recommendation, Prendes did not conduct an independent review of the candidates' qualifications; and that, having later reviewed the candidates' applications, Prendes now believed that Bush was the better qualified candidate. The court concludes that this evidence is sufficient to establish the "minimal" requirement of a causal link between the protected activity and the adverse employment action, and that Bush has therefore established a prima facie case of retaliation.

C

The court now turns to DHS's proffered legitimate, nonretaliatory reason for taking the adverse action in question—choosing Roemer over Bush for the AFOD position.

DHS has met its burden of production by introducing considerable evidence to support the finding that Roemer was selected over Bush because Roemer was the best candidate for the AFOD position. DHS has produced evidence that the three-member panel scored Roemer higher than Bush following a review of candidate resumés and interviews (which

were scored); Prendes selected Roemer from the five candidates she was given because of his background experience, including extensive experience supervising within the agency; the Career Board reviewed Prendes' recommendation and independently concluded that Roemer was well-suited for the job; and Venturella, the selecting official for the position, selected Roemer after reviewing Prendes' recommendation packet.  The burden now shifts back to Bush.

## D

## 1

Under the *McDonnell Douglas* burden-shifting framework, because DHS has produced evidence of a legitimate, nonretaliatory reason for the adverse employment action, Bush must prove "by a preponderance of the evidence that the reasoning presented by the defendant is a pretext for retaliation." *Smith v. Sw. Bell Tel. Co.*, 456 Fed. Appx. 489, 492 (5th Cir. 2012) (per curiam) (quoting *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 584 (5th Cir. 2006)) (internal quotation marks omitted).  Bush has two methods available to him to prove that DHS's proffered reason for selecting Roemer is pretextual: first, by showing that he is "clearly better qualified" than Roemer, the person selected for the position; or, second, by showing that DHS's proffered explanation is false or "unworthy of credence." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 (5th Cir. 2007); *see also id.* at 412 n.11 ("[A] showing that a plaintiff is 'clearly better qualified' is one way of demonstrating . . . pretext," but "[p]retext may be shown by any evidence which demonstrate[s] the employer's proffered reason is false.").  At the

- 24 -

summary judgment stage, of course, Bush need only present sufficient evidence to raise a genuine issue of material fact. *See, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *6 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.).

2

Bush contends that DHS's proffered reason for selecting Roemer is pretextual because DHS cannot establish that Roemer was the better candidate. In support of this argument, Bush offers a side-by-side comparison of his and Roemer's credentials. This comparison shows that Bush had held four supervisory positions whereas Roemer had held only three; Bush had worked for seven years and four months in a supervisory position with ICE/INS and for four years and two months in a supervisory position in the Navy whereas Roemer had worked for eleven years and one month in a supervisory position with ICE/INS; Bush had completed twenty-seven college semester hours and four quarter hours whereas Roemer had only completed eighteen college semester hours; Bush had served for six years in the Navy and attained ten-point veteran status whereas Roemer had not; and Bush had spent sixteen years with ICE/INS whereas Roemer had spent nine years, working in Big Spring since 2003. Bush also relies on Prendes' affidavit, in which she avers that after having reviewed all of the interview notes and application materials for Roemer and Bush, it is her opinion that Bush was the most qualified candidate for the position; evidence that Campos failed to follow Prendes' instructions that the panel give her a list of five finalists, along with the interviewers' notes and comments from the interviews, but without any kind of ranking or scoring, instead informing Prendes that the panel recommended Roemer "hands down" for

the AFOD position; evidence that Campos' statement was untrue, because the panel had never made a recommendation; and evidence that when Prendes sent her recommendation of Roemer to Washington, D.C. for final approval by Venturella, her memorandum and recommendation were not accompanied by the application packets for any of the five final candidates, so Venturella and the other members of the Career Board could not have seen the other applicants' qualifications and review the selection to verify that the most qualified candidate had really been selected.

DHS contends that Bush has failed to show how his qualifications clearly surpassed those of Roemer, and it cites Bush's deposition testimony that he did not feel that he was "more qualified [than Roemer] or underqualified.  I thought, based on experience and the type of jobs we have both done, I thought we were pretty close."  D. 12/24/14 App. 635.  DHS maintains that the panel reviewed the materials for all candidates, and that Roemer was the top scorer on the combined scores for resumé review and the interview; Roemer had more ERO experience and more ERO supervisory experience; and Prendes, the Career Board, and Venturella all agreed that Roemer was the best candidate for the AFOD position in Big Spring.  DHS posits that Bush cannot demonstrate that its proffered explanations are false or unworthy of credence because it is undisputed that different individuals, who were not the subject, and did not have knowledge, of Bush's EEO complaint were involved in the selection process.  DHS maintains that Bush has failed to establish that his protected activity was the "but-for" cause of not being selected for the AFOD position.

3

By attempting to rebut DHS's legitimate, nonretaliatory reasons based on evidence that he was better qualified than Roemer, Bush faces a high bar. *See Moss v. BMC Software, Inc.*, 610 F.3d 917, 923 (5th Cir. 2010) ("'The bar is set high for this kind of evidence.'" (quoting *Celestine*, 266 F.3d at 357)). This is because courts are not well-suited to evaluate the qualifications for promotions in other disciplines. *See EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1445 (5th Cir. 1995) (holding that evidence was insufficient to establish that plaintiff was "clearly better qualified" than selected applicants, and noting court's reluctance, absent vast disparities in qualifications, to substitute its evaluation of qualifications for those of individuals trained and working in the relevant field). Thus the employer's decision need only be "somewhere within the realm of reason." *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 282 (5th Cir. 1999) (rejecting argument that jury instruction regarding disparity in qualifications that stated that employer's judgment as to qualifications was not probative of discriminatory motive unless no reasonable employer would have made the same decision impermissibly elevated burden of persuasion in proving pretext). A fact finder can infer pretext only "if it finds that the [plaintiff] was 'clearly better qualified' (as opposed to merely better or as qualified)" than the person ultimately chosen for the position. *La. Office of Cmty. Servs.*, 47 F.3d at 1444. Accordingly, to create a genuine fact issue as to whether retaliation was the but-for cause for Roemer's being selected over Bush, he must "present evidence from which a jury could conclude that 'no reasonable person, in the exercise of impartial judgment, could have chosen

- 27 -

the candidate selected over the plaintiff for the job in question.'" *Moss*, 610 F.3d at 923 (quoting *Deines*, 164 F.3d at 280-81).

Bush has made no such showing. The summary judgment evidence would only permit a reasonable jury to find that Bush was better qualified than, or as qualified as, Roemer, but not *clearly* better qualified, and that a reasonable person, in the exercise of impartial judgment, could have chosen Roemer over Bush. Roemer and Bush received almost identical scores on their interview questions, with Roemer scoring a total of 105 points and Bush scoring a total of 104 points. DHS has produced evidence that, during the applicant interviews, each panel member independently evaluated and scored each interviewee's responses to eight interview questions. Roemer scored higher than Bush on four of the questions, Bush scored higher than Roemer on three, and Bush and Roemer tied on one. Overall, both Campos and Douglas scored Bush and Roemer equally, giving them 35 of 40 possible points, and Lynch scored Roemer slightly higher, giving him 35 points and Bush 34 points. To find that Campos persuaded the other panelists to downgrade Bush in retaliation for filing the EEO complaint, the jury would be required to find that this scoring—in which Bush or Roemer sometimes performed better than the other, and Campos (with an alleged reason to retaliate) and Douglas (with no such reason) scored Bush and Roemer equally—reflected a highly sophisticated and carefully planned form of deception. But as the court explains below, *see infra* § IV(D)(4), the summary judgment evidence would not support a finding that the other panelists had a motive to retaliate against Bush. Indeed, there is no evidence that Lynch, Douglas, Venturella, or the members of the Career Board even

knew that Bush had filed EEO Complaint 1.

When the three panelists took the resumés of Roemer and Bush into consideration, they each identified Roemer as the top candidate based on his more extensive ERO field supervisory experience. *See* D. 12/24/14 App. 238 (declaration of Douglas averring that "Mr. Roemer's overall assessment was higher than Mr. Bush's because Mr. Roemer's resume documented more ERO field supervisory experience than Mr. Bush's resume."); *id.* at 245 (declaration of Lynch averring that "Mr. Roemer edged Mr. Bush with more ERO field supervisory experience. Based on my review and evaluation of the resumes and the interviews and the scores of the candidates, it was and is my opinion that John Roemer was the best qualified for the position; he was the top ranked candidate. It appeared to me that Acting DFOD Douglas[] and DFOD Campos agreed, particularly given Mr. Roemer's many years of ERO supervisory experience."). Although Bush provides a "side-by-side comparison" of certain of his and Roemer's qualifications, he fails to explain why any particular qualification, alone or in combination with others, would have made him *clearly* better qualified than Roemer for the Big Spring AFOD position, particularly in light of Roemer's more extensive ERO supervisory experience. In sum, Bush has failed to produce evidence from which a reasonable jury could have found that he was *clearly* better qualified, and that a reasonable person, in the exercise of impartial judgment, could *not* have chosen Roemer over Bush.

4

Nor does Bush's other evidence create a genuine issue of material fact on the question whether DHS's proffered explanation for Bush's non-selection—i.e., that Roemer was the better-qualified candidate—was pretextual.

Of the numerous employees involved in the decision to hire Roemer over Bush for the Big Spring AFOD position—i.e., Lynch, Campos, Douglas, Prendes, Venturella, and the members of the Career Board—Bush does not allege that anyone other than Campos retaliated against him, and he adduces no evidence that Lynch, Douglas, Venturella, or the members of the Career Board even knew that Bush had filed EEO Complaint 1. *See Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 & n.6 (5th Cir. 2003) (an employee must, at the least, "produce at least some evidence that the decisionmakers had knowledge of his protected activity.").[15]  Bush instead attempts to establish pretext by arguing that Campos' influence was the sole reason Roemer was selected over Bush, relying on evidence that Prendes only recommended Roemer over Bush because Campos had informed her that Roemer was the panel's top choice.[16]

---

[15]Bush has produced evidence that on June 4, 2010 and on January 6, 2011, he informed Prendes of Campos' harassing acts targeted at him.

[16]Although Prendes acted based on Campos' recommendation, and Venturella and the Career Board based their decisions on Prendes' recommendation, Prendes had access to all of the top five candidates' application packets, was given sole discretion over whom to recommend to Venturella and the Career Board, and could have reviewed the resumés and interview notes for all of the candidates and selected any of the top five candidates whom she chose.  In her January 14, 2015 declaration, Prendes avers that if she had personally reviewed the panel notes for the interviewees, as well as the applications for the top five applicants,

To establish pretext, Bush relies on the fact that Campos informed Prendes that the "panel" recommended Roemer "hands down" for the Big Spring AFOD position.  He contends that Campos' statement is untrue because both Lynch and Douglas have stated in declarations that the panel never made a recommendation.[17]   But DHS has produced undisputed evidence that both Lynch and Douglas agreed that Roemer was the better qualified candidate.  *See* D. 12/24/14 App. 238; *id.* at 245.   And there is no summary judgment evidence that would enable a reasonable jury to find that Campos did not actually believe Roemer was the better qualified candidate.  Moreover, although the panel provided Prendes an unranked list of the top five candidates, it stated in its memorandum to Prendes that "[t]here are vast differences in experience and interview rankings within the top-five for each location, which can be provided upon request."  D. 12/24/14 App. 77.  This suggests that the panel in fact believed that certain of their top five candidates were more qualified than others.  And Bush has produced no evidence that would enable a reasonable jury to find that the panel did *not* actually agree, based on their review of the candidates' interview responses and resumés, that Roemer was "hands down" the better choice for the Big Spring AFOD position.  The court concludes that evidence that Campos informed Prendes that

she would have recommended Bush for the AFOD position.  Yet on February 3, 2012 she recommended Roemer for the position "without hesitation" based on his over twenty years' of solid law enforcement experience with nine years and eight months of supervisory experience in ERO.  D. 12/24/14 App. 80-81.

[17]What Lynch and Douglas actually aver in their declarations is that they did not recommend a specific candidate to fill the vacant position because Prendes had instead asked for the top five candidates in unranked order.

Roemer was "hands down" the panel's top choice is insufficient, without more, to enable a

reasonable jury to find that Campos' desire to retaliate against Bush for filing EEO

Complaint 1 was the but-for cause of his not being selected for the AFOD position.  *See*

*Nassar*, 133 S.Ct. at 2533.  In other words, based on the summary judgment record, a

reasonable jury could not find that Roemer would not have been selected over Bush for the

AFOD position but for Campos' desire to retaliate against Bush for filing EEO Complaint

1.[18]  The court therefore grants DHS's motion for summary judgment on Bush's retaliation

_____

[18]In his reply in support of his own motion for summary judgment, Bush contends that
Campos' mere presence on the selection panel, while an active EEO complaint was pending
against him, constitutes retaliation under *Bible v. Harris County Texas*, 273 F.3d 1108, 2001
WL 1131925, at *5 (5th Cir. Sept. 19, 2001) (unpublished opinion).  In *Bible* the Fifth
Circuit held that the plaintiff had satisfied the causal nexus element of her retaliation claim
based on non-selection for promotion by producing evidence

> (1) that, despite its knowledge of [plaintiff's] previous complaint
> and at a time when it also knew that [plaintiff] had applied for
> the Senior Officer position, HCCSCD placed on the [promotion
> review committee] the very man who had harassed [plaintiff]
> and about whom she had previously complained; (2) that the
> process used to score applicants permitted a single panel
> member, such as her harasser, to veto her promotion; (3) that,
> despite her request that her harasser be replaced on the
> [promotion review committee] by one of any number of
> qualified available replacements HCCSCD refused to do so; (4)
> that, despite her reminder to HCCSCD on the day of her
> interview of the previous arrangement whereby her harasser was
> to have no influence over her career advancement, HCCSCD
> required her to proceed with her interview; (5) that her harasser
> actively distracted her during her interview and that her
> interview was significantly shortened as compared to others; (6)
> that the unauthenticated scoring process was highly subjective;
> and (7) that she was a well-respected officer who was more
> qualified for the Senior Officer position than at least one of the

claim.

Because Bush has failed to defeat DHS's summary judgment motion on his retaliation claim, it follows that he has not established his retaliation claim beyond peradventure. Accordingly, the court denies Bush's motion for summary judgment on this claim.

E

To the extent that Bush intends to plead a claim for "racial discrimination" based on his non-selection for the AFOD position, DHS moves for summary judgment on the basis that because Roemer and Bush are both Caucasian, Bush cannot meet the fourth element of a prima facie case. The court agrees.

To establish a prima facie case of race discrimination under Title VII, Bush must establish that (1) he is a member of a protected class, (2) he sought and was qualified for an available employment position, (3) he was rejected for that position, and (4) DHS either filled the position with someone outside the protected class or continued to seek applications with Bush's qualifications. *See, e.g., Jinks v. Advanced Protection Sys., Inc.*, 162 F.Supp.2d 542, 546 (N.D. Tex. 2001) (Fitzwater, J.) (citing *Grimes v. Tex. Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996)). It is undisputed that Roemer, who

—————————————

applicants who were ultimately promoted over her.

*Id.* Unlike in *Bible*, there is no evidence that the interviews and scoring of candidates were unfair, that Bush voiced an objection to Campos' presence on the panel, or that Bush was more qualified than the applicant who was ultimately selected. Rather, each panel member independently scored the applicants' interview responses, and there is no evidence that Campos' presence on the panel unfairly influenced their opinion that Roemer was the more qualified applicant.

was selected for the Big Spring AFOD position, is Caucasian and therefore within the same protected class as Bush, and that DHS did not reject Bush and then continue to seek applications with Bush's qualifications.  Accordingly, to the extent Bush intends to plead a claim for race discrimination, the court grants DHS's motion for summary judgment and dismisses this claim.

V

Finally, the court turns to Bush's FOIA claim.

DHS moves for summary judgment on this claim, contending that Bush has failed to provide any evidence that he made a proper FOIA request, and that because Bush failed to exhaust his administrative remedies, the court lacks subject matter jurisdiction over the claim. Bush has not responded to DHS's arguments regarding this claim.  Although this failure does not permit the court to enter a "default" summary judgment on this claim, *see Tutton v. Garland Independent School District*, 733 F. Supp. 1113, 1117 (N.D. Tex. 1990) (Fitzwater, J.), "[a] summary judgment nonmovant who does not respond to the motion is relegated to [his] unsworn pleadings, which do not constitute summary judgment evidence," *Bookman v. Shubzda*, 945 F.Supp. 999, 1002 (N.D. Tex. 1996) (Fitzwater, J.) (citing *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991)).  And

> [i]f a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion [and] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]

- 34 -

Fed. R. Civ. P. 56(e)(2) and (3).

Accordingly, because Bush has not raised a genuine issue of material fact on his FOIA claim or established that he has exhausted his administrative remedies, the court grants DHS's motion for summary judgment dismissing this claim.[19]

\*   \*   \*

For the reasons explained, the court denies plaintiff's motion for summary judgment, grants DHS's motion for summary judgment, and dismisses this action with prejudice by judgment filed today.

**SO ORDERED**.

July 27, 2015.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[19]Bush has filed a motion for leave to designate an economic expert.  In light of the court's decision today, the motion is denied as moot.